## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN H. BARI and LESLIE S. BARI, H/W, | : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | |
| | : | No. 15-2331 |
| ROBERT SAEID FARIVAR and FIROOZEH MOSTASHARI, H/W, | : : | |
| Defendants. | : | |

### MEMORANDUM OPINION

TIMOTHY R. RICE                                                    March 26, 2018
U.S. MAGISTRATE JUDGE

Plaintiffs Leslie and Jonathan H. Bari ("the Baris") allege Defendants Robert Saeid Farivar and Firoozeh Mostashari ("the Farivars") defrauded them and violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") by failing to disclose defects in a home ("the Home" or "the Property") the Baris purchased from them in 2014. They seek compensatory damages totaling approximately $594,000, along with treble and punitive damages and legal fees. As explained below, I conclude that the Baris have failed to prove their claims and I will enter judgment in favor of the Farivars.

This is an unfortunate case of buyers who coveted an elegant and historic home, but ignored or failed to fully investigate warnings and disclosures of potential defects in the Property. After realizing the scope of the problems upon purchase, the buyers desperately sought to depict the sellers as frauds who lured them to purchase the Home through lies, half-truths, and trickery. Sadly, the evidence portrays two sophisticated, detail-oriented, and well-educated buyers, who now suffer from buyers' remorse, not fraud.

The Home, which is located along the Main Line of suburban Philadelphia, was constructed in 1807, shortly after our nation was founded, with additions built in 1941 and 1985. After an unsuccessful attempt to purchase the Home from a previous owner in 2012, the Baris purchased the Home from the Farivars just two years later. Despite having benefited from two comprehensive inspections of the Home, the Baris now report problems with the heat, air conditioning, drainage and water infiltration, tennis court, pool, and Internet wiring.[1] The Baris contend the Farivars knew about those problems and unlawfully hid them. The Farivars assert they either disclosed, adequately remedied, or did not know about the problems.

Based on my observations of the parties' demeanor and review of the evidence, I find Mr. and Mrs. Bari's testimony mostly sincere, but often exaggerated and embellished. I instead credit the testimony of Dr. Farivar and Mrs. Mostashari. Although the Baris blame the Farivars for multiple problems in the Home, I conclude that the Farivars disclosed what they knew to the Baris. To the extent they omitted information, or did not update their disclosure statement, the Baris have failed to show that such information needed to be disclosed or that they suffered damages as a result of the Farivars' actions.

The Baris' main allegation, concerning the defective heating system, was disclosed by the Farivars before the Baris purchased the Home. The disclosure gave the Baris ample opportunity to explore potential causes of the heating problems. They did so, even enlisting a plumbing and heating contractor to supplement the standard home inspection. The Baris likewise had notice of the drainage and water infiltration issues based on disclosures made by the Farivars and the Home's previous owner, as well as candid warnings provided during their two inspections of the

---

[1] Since moving into the Home, the Baris have blamed the Farivars for extensive problems, including broken windows, tiki torches left in the garage, rotten food left under appliances, and an overgrown garden. The Baris now limit their claims to the above six issues.

Home.  Recognizing this, the Baris base their claim on the Farivars' failure to tell them of the need to keep the drains clear during rainstorms, which was not a defect and did not trigger disclosure.

Although the Baris also charge the Farivars with failing to disclose issues related to the air conditioning, damage to the tennis court following a winter storm, and a water line leak, not all of this information constituted defects that required disclosure.  Indeed, the Farivars timely remedied much of the damage – conduct that the Baris claim shows the Farivars' attempts to mislead them.  Instead, I find the Farivars acted in good faith to maintain the Property and transfer it in good condition.

Based on the evidence presented at trial, and pursuant to Federal Rule of Civil Procedure 52, I make the following findings of fact and conclusions of law by a preponderance of the evidence.

## FINDINGS OF FACT

1.      The Home sits at the bottom of a long downhill driveway and consists of three main parts.  N.T. 8/3/2017-II at 118; N.T. 8/4/2017 at 89.  The center section, which includes a kitchen, living room, dining room, and several upstairs bedrooms, dates back to 1807, although some parts have been recently modernized.  N.T. 8/3/2017-II at 117-18; Plaintiff Exhibit ("P") 1121.  The right side, which includes a family room, bar room, and guest room, was built in 1941.  N.T. 8/3/2017-II at 117-18; P1121.  The left side, which includes a garage and upstairs master bedroom, was built in 1985.  N.T. 8/3/2017-II at 117-18; P1121.

2.      The Property also features a pool, pool house, tennis court, and gym situated on five acres of land with several hundred trees.  N.T. 8/4/2017 at 87-88.

3. In July 2012, the Baris entered into an Agreement of Sale for the Property with Todd and Barbara Albert, who had owned the Home since 2000. N.T. 8/3/2017-II at 84; P1083; Defendant Exhibit ("D") 7 at Bari3158.

4. During that transaction, the Alberts provided the Baris with a Seller's Property Disclosure Statement ("Albert SPD"), in which they stated that they did not know of any problems related to the nine-year-old heating system. N.T. 8/3/2017-II at 84; D7 at Bari3160.

5. The Alberts also stated there were no problems with the air conditioning system, which was upgraded with a new unit in 2006 and completely rezoned in 2010. D7 at Bari3053; D8 at Bari45.

6. The Alberts reported that the Property had two sump pumps, and noted "water leakage, accumulation, or dampness within the basement or crawl space." D7 at Bari3158. In an addendum, the Alberts explained that water had damaged the basement in the summer of 2004 after a substantial rainfall. Id. at Bari3164. The damage was repaired and remediated. Id. Three drains were installed on the driveway and a "rubber membrane" was placed along the front portion of the Home to prevent water from entering the basement. Id.

7. The Alberts additionally stated they knew of "past or present drainage or flooding problems affecting the property." Id. at Bari3161. They explained that "[i]n the summer of 2011, the finished center section of the basement received approximately ¼ to ½ inch of water during a hurricane in which an estimated 8 inches of rainfall was recorded in a 24-hour period in the southeastern portion of Pennsylvania. Water was cleaned up and mold prevention measures were taken." Id. at Bari3165.

8.      In mid-July 2012, the Baris had various inspections performed at the Home, including a general inspection of all the Home's major systems and components, and inspections of the tennis court, pool, and trees.  N.T. 8/7/2017-II at 17-18; D10; D13; D14 at Farivar4368-70.

9.      Inspector Michael Baltrush of ValueGuard Home Inspections completed the general inspection and reported that the heating system, which consisted of two boilers, "functioned properly when tested and appear[ed] in generally good condition."  D10 at Farivar3016.  Baltrush used an infrared thermometer to determine that the radiators and baseboards were getting hot, and found no lack of heat at any of the radiators or baseboards in his report.  N.T. 8/7/2017-I at 43.  Baltrush cautioned that "[t]he adequacy of heat distribution is difficult to determine during a one-time visit to the home."  D10 at Farivar3016.

10.     Baltrush noted that the two air conditioning compressors responded properly to operating controls.  Id. at Farivar3017.  Observing condensation on ductwork and water stains on the floor, Baltrush recommended further evaluation by a qualified HVAC technician.  Id.

11.      Baltrush warned the Baris that basement leakage during rainy periods or spring "is a way of life" for owners of older homes.  Id. at Farivar3008.   He explained that such leakage rarely influences the structural integrity of the home, but precautions must be taken to avoid damage to storage and personal belongings.  Id.  Baltrush noted that a waterproofing system had been installed in the front wall of the basement, and recommended the Baris consult the Alberts to obtain additional information.  Id.

12.     Baltrush also warned that the "front porch and grading were lower/sloped toward the house," and the driveway "slopes toward the house/garage," which could allow water to enter the Home.  Id. at Farivar3012.  He explained that surface drains had been installed to control the drainage, and again urged that the Baris consult the Alberts for more information.  Id.

13. The tennis court inspector reported that although 90 percent of courts older than 15 years contain some structural cracks, the Alberts' court had none. D13 at Bari3248. He also recommended that the court be resurfaced because it showed signs of wear. Id.

14. The tree inspection report noted approximately eight trees surrounding the tennis court that needed to be removed, as well as "hanging broken limbs" that were "damaging light fixtures." D14 at Farivar4370; N.T. 8/7/2017-II at 39-40.

15. After the inspections were completed, the Baris sent the Alberts a 10-page spreadsheet outlining the problems found during the inspections and asked the Alberts to remedy some of the problems, including removing the trees around the tennis court that had "damaged lighting fixtures and could continue to damage lighting fixtures, [the] court, and fencing." D14 at Farivar4364-80; N.T. 8/7/2017-II at 32-37.

16. When the Alberts and Baris failed to agree on those issues, the Baris terminated the agreement of sale. N.T. 8/3/2017-I at 91-92.

17. On August 3, 2012, the Farivars agreed to purchase the Property from the Alberts. P653.

18. The Farivars arranged for an inspection of the Home on August 9, 2012. N.T. 8/7/2017-II at 176-80; P24; P25. A few days later, the inspector emailed the Farivars a report outlining several defects, including uninsulated air conditioning ducts. P25, P24 at Farivar4047-4049; N.T. 8/7/2017-II at 183-84. The inspector recommended cleaning and insulating the ducts. P24 at Farivar4046-4049. The inspector testified that the uninsulated ducts did not impact the effectiveness of the air conditioning system; rather, the lack of insulation could cause condensation, dripping water, and possible mold. N.T. 8/7/2017-II at 183-85.

19.     The Farivars' inspection report cited no other defects related to the air conditioning, heating, water infiltration and drainage, tennis court, pool, or Internet wiring.  P24; N.T. 8/7/2017-II at 187-88.

20.     The Farivars never read the report.  N.T. 8/8/2017-II at 62-62; N.T. 8/9/2017 at 67.  Instead, Dr. Farivar talked briefly with the inspector about whether the House had any major defects.[2]  N.T. 8/9/2017 at 67; see also P25.

21.     In September 2012, the Farivars purchased the Home from the Alberts for $1,700,000.  P653 at Farivar6182.

22.     One of the first improvements made by the Farivars, based on Mrs. Albert's recommendation, was to enlarge the drain in the front of the Home to make it more effective.  N.T. 8/8/2017-II at 38; P9A at Bari3002.

23.     Because Mrs. Albert advised the Farivars to make sure the driveway drains were clear during storms, Mrs. Mostashari was vigilant about clearing the drains pursuant to a bi-yearly maintenance schedule, and before and during storms.[3]  N.T. 8/8/2017-II at 37-39; N.T. 8/9/2017 at 62; P35 at 222.

24.     The Farivars noticed the basement was moist after one storm and installed a second dehumidifier to help remedy this situation.  N.T. 8/9/2017 at 61-62, 65; P34 at 201-11; P9A at Bari3001.

---

[2]     Although Dr. Farivar testified during his deposition that he did not talk to the inspector, I find his trial testimony that he and the inspector "had a short phone call" more credible because it is consistent with the inspector's email to Mr. Farivar regarding the report.  See 8/9/2017 at 66-67; Ex. 34 at 119; P25 ("Robert, it was nice speaking with you via phone.").

[3]     The periodic cleaning by Mrs. Mostashari consisted of the commonsense measure of brushing leaves and yard debris off the drain grate.  See N.T. 8/8/2017-II at 38-39.

25.     The Farivars testified that they did not otherwise experience water in the basement or any other area of the Home.  N.T. 8/8/2017-II at 39; N.T. 8/9/2017 at 61-62, 64.  I credit their testimony because it is corroborated by the Alberts, who reported experiencing water infiltration only twice, after substantial storms.  Moreover, the Farivars were in the Home for just 22 months and there was no evidence of a rainfall during that time sufficient to cause water infiltration.[4]  To the extent there was such a rainfall, the Farivars took precautionary measures to avoid water infiltration.

26.     On December 28, 2012, the Farivars called Oliver Heating and Cooling, pursuant to their maintenance contract, about the heat.  See N.T. 8/3/2017-I at 15; D109.  The technician reported the issue on the service ticket as "insufficient heat [in] one wing."  See N.T. 8/3/2017-I at 16; D109.  The technician determined that a thermostat was miswired, corrected the problem, and reported the heat as working when he left.  D109.  This service call does not show that the Farivars knew about a material defect with the heat because Oliver remedied the problem.

27.     Approximately one week later, the Farivars called Oliver again.  See N.T. 8/3/2017-I at 16; D110.  The technician reported the issue as a "call back" for "insufficient heat."  D110; see also 8/3/3017 I at 16-17.  The technician determined further investigation was needed because "3 zone valves under the crawl space are opened, and yet the baseboards on that zone are not getting hot."  D110.  Those valves went to the bar area in the right wing of the Home.  N.T. 8/3/2017-I at 17.  The technician noted the Farivars had an upcoming appointment with a different Oliver technician, Roger Mauger.  D110.  This service call alerted the Farivars to an unresolved problem with the heat in the right wing.

---

[4]     The Baris also did not experience significant flooding and water infiltration until nine months after they moved into the Home.  See infra at ¶ 123.

28.     A few weeks later, on January 26, 2013, Dr. Farivar emailed the Baris, asking if they were still interested in the Home because he may be putting it back on the market.  P632, Bari0006; N.T. 8/3/2017-II at 94-95.

29.     Later that day, Mr. Bari spoke with Dr. Farivar, who explained that he was considering selling the Home because he still owned a home in Iowa, he wanted to live closer to his job in Philadelphia, and he wanted a more open and modern home.  N.T. 8/3/2017-II at 95. Mr. Bari followed up with an email to Dr. Farivar, seeking an opportunity to meet the Farivars to discuss a possible private sale of the Property.  P632, Bari0007.

30.     Two days later, on January 28, 2013, the Farivars called Oliver again about the heat.  D113.  Mauger went to the Home and noted the reason for the call as "insufficient heat." Id.; see also N.T. 8/3/2017-I at 20.  Mauger determined a pressure temperature valve and a relief valve for the boiler were leaking and ordered new parts.  D113; see also N.T. 8/3/2017-I at 20.

31.     Mauger also explained on the service ticket that he "educated [Mrs. Mostashari] on the heating and A/C troubles of [the] home that are preexisting to the purchase of the home." D113; see also N.T. 8/3/2017-I at 20, 58-59.  Mauger testified that he discussed the heat in the right wing because that was the "only area" he knew had an issue.[5]  N.T. 8/3/2017-I at 21.  Mrs. Mostashari also said that Mauger spoke to her only about the heat in the right wing.  N.T. 8/8/2017-II at 20 ("he said that this wing of the house has always had issues with unreliable heat").  Based on their credible testimony, I find that Mrs. Mostashari knew about an unresolved heat problem in the right wing as a result of this service call.

---

[5]     The Baris argue that Mauger's testimony about information not documented in service tickets is unreliable.  I disagree.  Mauger was unbiased and credible, and accurately recalled his work at the Home with the help of the service tickets.

32.     Mauger characterized the right wing heat as "intermittent" because it worked unless it was freezing cold outside.[6]  N.T. 8/3/2017-I at 5, 6, 63.

33.     Mauger could not recall what he told Mrs. Mostashari about the air conditioning other than recommending that the right wing air conditioning unit be replaced with a heat pump. N.T. 8/3/2017-I at 22; N.T. 8/8/2017-II at 16.

34.     The Farivars did not call Oliver for heating issues during the remainder of the 2013 winter.  See P1; Plaintiffs' Proposed Findings of Fact and Conclusions of Law (doc. 149) ("Pl. Findings") ¶ 95.[7]

35.     The Farivars, however, used portable space heaters in the right wing to help warm that area.  N.T. 8/8/2017 at 33; N.T. 8/9/2017 at 59-60; P34 at 169.

36.     In early February, the Farivars informed the Baris that they had decided not to sell the Home.  N.T. 8/3/2017-II at 96.  The Baris emailed the Farivars several times after that to see if they had changed their minds.  Id. at 96-97.

37.     In late April 2013, Oliver returned to the Home to check the three air conditioning units.  D116; N.T. 8/3/2017-I at 23.  After replacing the air filters, flushing the drains and traps,

---

[6]     William Valinote, another Oliver employee, was the HVAC technician who serviced the Home while the Alberts lived there.  N.T. 8/8/2017-I at 4.  He later became a technical manager and spoke with Mauger by telephone about HVAC issues at the Home.  Id. at 4-6.  Although he testified that the right wing heat got worse as the temperature got colder, he denied that the heat was "intermittent."  Id. at 14, 18-19.  He also stated in an email that the Alberts and Farivars would not address the heating issues in the right wing.  Id. at 5-6; P429.  However, Valinote never went to the Home while the Farivars lived there or spoke to them about the heating issues. N.T. 8/8/2017-I at 8-9.  As a result, his statements about the Farivars' alleged unwillingness to address the heating issues in the right wing were speculative and inadmissible.  See Fed. R. Evid. 602.

[7]     Although the Baris refer to service calls in the winter of 2013, those exhibits were not introduced as evidence at trial.  See Pl. Findings ¶ 95.  Even if they had been admitted, they are irrelevant because those calls related to a water leak, replacing the previously-ordered pressure temperature and relief valves, and plumbing issues.  See id.

and performing other checks, the technician reported that all three systems were "operational." D116. The technician also recommended upgrading the air filters and obtaining a new unit in the right wing because it was 28 years old and in poor condition. Id.; N.T. 8/3/2017-I at 23-24.

38.     The Farivars did not call Oliver about air conditioning issues during the summer of 2013.[8] See P1; Pl. Findings ¶ 95.

39.     In October 2013, Oliver performed an annual service check on the Home's heating system and determined that it was operating properly. D118; N.T. 8/3/2017-I at 24-25.

40.     In the fall of 2013, the Farivars informed the Baris that they were moving because Dr. Farivar had obtained a new job in Minnesota. N.T. 8/3/2017-II at 97. They inquired whether the Baris were interested in purchasing the Home. See id.

41.     On December 9, 2013, the Farivars called Oliver about the heat. D119; N.T. 8/3/2017-I at 25. Mauger went to the Home and noted "no heat right wing" as the reason for the call on the service ticket. D119; see also N.T. 8/3/2017-I at 25. He stated a "purge" did not work, three zones in the crawlspace were open, and the main pipe and radiator on the second floor were hot. D119; see also N.T. 8/3/2017-I at 25. Mauger said there was either an "airbound or flow issue" that required an investigation by the plumbing department and noted that "this has been an issue dating back before Oliver and prior owners." D119; see also N.T. 8/3/2017-I at 25-26. The service ticket was signed by Dr. Farivar. N.T. 8/8/2017-II at 21. Based on this service call, I find that Dr. Farivar knew that either an airbound or flow issue related to the heat in the right wing still needed to be investigated.

---

[8]     The Baris note a service call in May 2013 to replace the air filters, as recommended during the April 2013 air conditioning checks. See Pl. Findings ¶ 95. Evidence of that visit, however, was not introduced as evidence at trial. In any event, it did not involve an actual service call by the Farivars.

42.     At approximately 4:00 p.m. on December 11, 2013, the Baris met the Farivars at the Home.  P1; N.T. 8/7/2017-II at 42.  Although it was approximately 32-34 degrees Fahrenheit outside, Mr. Bari did not notice any issues with the heat in the Home.  N.T. 8/7/2017-II at 41-44; D80; D81.

43.     The following day, the Farivars provided the Baris with a list of additions and improvements.  N.T. 8/7/2017-I at 44-45; D21.  The list did not note any improvements to the tennis court lights or the air conditioning ductwork.  Id.; N.T. 8/7/2017-I at 46.

44.     On December 13, 2013, the Farivars again called Oliver.  D120.  Mauger noted on the service ticket that "one boiler [was] not coming on" because a wire on the relays attached to the boiler was not connected.  D120; N.T. 8/3/2017-I at 28.  After he reconnected the wire, both boilers came on during a cycle.  D120.  Because Oliver resolved the heat issue, I find that this service call did not further alert the Farivars to a defect with the heat.

45.     On December 18, 2013, the Farivars provided the Baris a Sellers' Property Disclosure Statement ("Farivar SPD").  N.T. 8/3/2017-II at 97; P9A.

46.     The Farivar SPD noted the Farivars were required by the Pennsylvania Real Estate Seller Disclosure Law, 68 Pa. C.S. § 7301 et seq. ("RESDL"), to "disclose to a buyer all known material defects about the property that are being sold that are not readily observable." P9A at Bari3000.  It defined material defects as problems "with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to people on the property."  Id.; see also 68 Pa. C.S. § 7102. However, "[t]he fact that a structural element, system or subsystem is beyond the end of [its] normal useful life . . . is not by itself a material defect."  P9A at Bari3000; 68 Pa. C.S. § 7102.

47.     The Farivar SPD further stated it included "disclosures beyond the basic requirements of the law in an effort to assist buyers in evaluating the property" and did not relieve the Farivars of their "obligation to disclose a material defect . . . not addressed on [the] form." P9A at Bari3000. The SPD, however, "was not a substitute for any inspection or warranties that [the Baris] may wish to obtain." Id.

48.     The Farivars stated on the SPD that the Property had one sump pump, which was in good working order. Id. at Bari3001. They also were aware of "water leakage, accumulation, or dampness within the basement or crawl space" and knew about "repairs or other attempts to control any water or dampness problem in the basement or crawl space." Id. The Farivars explained that the "basement [was] moist during rain storm [and they] installed [a] dehumidifier to [the] sump pump." Id.

49.     The Farivars stated they were not aware of any "fire, storm, water or ice damage to the property." Id. They did know about floor damage, and noted the living room had a 2x3 foot area of warped floorboard. Id.

50.     The Farivars said that the heating system was serviced "under contract" and "fireplaces" were "an additional and/or backup heating system." Id. at Bari3004. The Farivars did not mention their use of space heaters as an additional and/or backup heating system. Id.

51.     The Farivars stated that they were aware of "problems or repairs needed" for the heating system, explaining the "family room heat is intermittent, predates our purchase, bar room heat is intermittent, guest room above family room heat [is] cool if very cold." Id.

52.     The Farivars stated that they were not aware of any problems with the air conditioning. Id. at Bari3005.

53.     The Farivars also said they did not know of "any past or present drainage or flooding problems affecting the property," or "any past or present drainage or flooding mitigation on the property." Id. at Bari3006.

54.     The Farivars stated they were not aware of any other material defects to the Property. Id. at Bari3008. They agreed to update the SPD if they learned of "additional information about the property, including through inspection reports from a buyer." Id.

55.     In early January 2014, the Farivars spoke with Oliver about replacing the air conditioning unit with a heat pump, as Mauger had recommended. N.T. 8/8/2017-II at 16. Oliver informed the Farivars that it did not carry the appropriate size heat pump and they should contact another company, such as Sila Heat and Air Conditioning. Id.

56.     On January 16, 2014, Matthew Migliore at Sila provided the Farivars a work order for a heat pump/air handler ("heat pump") for $7,396. N.T. 8/7/2017- I at 6-7; N.T. 8/8/2017-II at 24-25; P464 at Farivar3404; P472.

57.     A few weeks later, on February 4, 2014, the Farivars and Baris, with the assistance of counsel, entered into an agreement of sale ("Sale Agreement") for the Property for $1,835,000. N.T. 8/7/2017-II at 67-68, 89-90; D24. Settlement was scheduled for June 23, 2014. D24 at Bari372.

58.     In the Sale Agreement, the Baris elected to undertake several types of inspections of the Property between March 4 and March 13, 2017. D24 at Bari376. Within this same period, the Baris could: (a) accept the Property with the information stated in the inspection reports and agree to the release in the Sale Agreement; (b) terminate the Sale Agreement and obtain a refund of their deposit; or (c) present the inspection reports to the Farivars with a proposal for corrections and/or credits. Id.

59.     The Farivars agreed to "maintain the Property, grounds, fixtures and personal property specifically listed in [the] Agreement in its present condition, normal wear and tear excepted." Id. at Bari378. "If any system or appliance included in the sale of Property [were to] fail before settlement," the Farivars agreed to: (a) repair or replace the failed system or appliance before settlement; or (b) provide prompt written notice to the Baris of their decision to: (i) credit the Baris at settlement for the fair market value of the failed system or appliance; or (ii) not repair or replace the failed system or appliance, and not credit the Baris at settlement. Id. at Bari378-379.

60.     The Sale Agreement stated that it contained "the whole agreement between [the parties], and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale." Id. at Bari379. It explained that any representations and claims made by the Farivars were not part of the Agreement "unless expressly incorporated or stated in [the] Agreement." Id. Further, the Agreement could not be changed or modified "except in writing executed by the parties." Id.

61.     The Baris agreed "to purchase the Property IN ITS PRESENT CONDITION, subject to the inspection contingencies elected in [the] Agreement." Id. (emphasis in original). They also agreed to release and discharge the Farivars from "any and all claims, losses or demands, including . . . property damage and all of the consequences thereof, whether known or not, which may arise from . . . any defects or conditions on the Property." Id. at Bari380. If the Farivars violated the terms of the Sale Agreement or the seller disclosure laws or regulations, the release did not deprive the Baris "of any right to pursue any remedies that may be available under law or equity." Id.

62.     The Baris and Farivars also executed an Addendum to modify and supplement certain provisions of the agreement.  D24 at Bari393.  In the event of a conflict between the Addendum and the Sale Agreement, the Addendum would prevail.  Id.  In the Addendum, the Farivars agreed to provide written updates to their SPD within two days of "any event/issue transpiring that would require disclosure under the [SPD if the Farivars] were filling out a new [SPD] at that time after an event/issue transpired."[9]  Id. at Bari394.

63.     On the same day that the Sales Agreement and Addendum were executed, Mrs. Mostashari met with Migliore from Sila and signed the work order for the new heat pump.  P472.

64.     The next day, February 5, 2014, Migliore sent Mrs. Mostashari an email stating that they would need to use a different brand heat pump to fit into the designated space, and confirming that the device was "a supplementary (back up) heating source for these rooms as the boiler zone is not working."  P465; N.T. 8/7/2017-I at 13; N.T. 8/8/2017-II at 25-27.  Mrs. Mostashari testified that she told Migliore about the right wing problems as part of explaining why they needed a heat pump.  N.T. 8/8/2017-II at 26-27.  I find Mrs. Mostashari's testimony credible because Migliore also testified that he believed Mrs. Mostashari had told him that information and he did not make any diagnosis of the right wing hearing issues.  N.T. 8/7/2017-I at 6.  It also was consistent with the Farivars' earlier disclosure of heating issues in the right wing.

65.     Migliore also stated in his email that he wanted to be "100% sure [Mrs. Mostashari understood] that this is not going to be a perfectly temperate room in the winter time.

---

[9]     The Addendum language required the Farivars to update the SPD with any issue that "the buyers" would have to disclose in a new SPD.  I find the reference to "the buyers" was a mistake because sellers, not buyers, complete a disclosure statement.  See D24 at Bari394; P9A.

On the cooling side this unit will be fine." P465 at Farivar571. Mrs. Mostashari replied that she understood. Id. at Farivar572.

66. Sila installed the heat pump on February 10. Id. at Farivar574. That same day, Mrs. Mostashari emailed Migliore at Sila about balancing the system because almost no air was coming from the vents in the bar. Id.; N.T. 8/8/2017-II at 27. A few days later, Mrs. Mostashari noted in a follow up email to Migliore that she "love[d] it warm." P465 at Farivar575.

67. On February 26, 2014, Sila returned to the Home to balance the system. N.T. 8/8/2017-II at 27; P464 at Farivar3407. The technician "made adjustments to the airflow of the heat pump system" and noted everything was working "ok." P464 at Farivar3407. However, he also noted that the heat pump would "not completely fix the lack of heat to the bar/sitting area." Id. He explained the "ductwork for system is not ideal – to heat more evenly, it should be re-configured but is limited by space." Id.

68. Migliore testified at trial that the heat pump was operating and improved the heat, but it was not a complete remedy and may not provide enough heat for some people. N.T. 8/7/2018-I at 18, 26-28, 30, 32.

69. During a February 2014 storm, several trees fell on the Property. N.T. 8/8/2017-II at 42-43, 49. Photographs taken by Mrs. Mostashari show: (a) a tree lodged on the tennis court fence near the backboard, N.T. 8/8/2017-II at 44; P482 at Farivar4421; (b) damage to the tennis court fence from the tree, N.T. 8/8/2017-II at 46; P482 at Farivar4423; and (c) a tree limb lying on top of snow covering the tennis court, N.T. 8/8/2017-II at 44; P482 at Farivar4422.

70. On February 24, 2014, Mrs. Mostashari called her insurance company to see if the tree removal was covered. See N.T. 8/8/2017-II at 45; P490; P477. The company prepared a claim report describing the "loss" in various ways: (a) "Multiple trees down on the property and

[Insured] believes damage to tennis court"; (b) "several trees down [approximately] 3 feet in diameter"; (c) trees "fell on tennis court and tennis court metal railing, about an 8 foot section"; and (d) "there are 4 trees down total on the property, there is a huge one down in the back and a huge one on the driveway." P477 at Bari5148; see also N.T. 8/8/2017-II at 50-51. Mrs. Mostashari testified that she did not realize that her call prompted this claim report, and I find her testimony credible. N.T. 8/8/2017-II at 45.

71.     Although the insurance report stated that Mrs. Mostashari reported tennis court damage, Mrs. Mostashari testified that she solely intended to report damage to the tennis court fence because that was all she observed. N.T. 8/8/2017-II at 45. I find this testimony credible because Mrs. Mostashari would not have been able to see any damage to a tennis court covered with snow. N.T. 8/7/2017-II at 73.

72.     The Farivars ultimately did not pursue insurance coverage because the damage did not exceed their deductible. N.T. 8/8/2017-II at 49; P477A.

73.     Mrs. Mostashari also met with a tree company about the fallen trees on February 24. N.T. 8/8/2017-II at 52; P483. Regarding the trees near the tennis court, the company proposed: "clean[ing] up of down limbs in pool area, between pool area and tennis court, remove 16 [inch] diameter fir top that [has] damaged the tennis court fence, down limbs around the tennis court, climb one white pine to remove hanging limbs (this tree is close to the tennis court fence on the driveway side), remove down pine limbs on eastern property line." P483 at Farivar538. The proposal did not note a fallen tree on the tennis court.

74.     Mrs. Mostashari asked the company to perform the proposed work "as soon as possible" because they were showing the Home to the Baris the following week. Id. at

Farivar536.  A few days later, the tree company performed the work and removed down tree limbs near the driveway for $990.00.  Id. at Farivar540.

75.     Around the same time, Mrs. Mostashari also had the tennis court fence fixed. N.T. 8/8/2017-II at 52.

76.     Mrs. Mostashari testified that she had the trees removed and fence fixed so the Home would look nice when the Baris inspected it.  Id. at 53.  I find her testimony credible.

77.     The Baris scheduled an inspection of the Home by the same inspector they used in 2012, Michael Baltrush of ValueGuard, for March 4, 2014.  N.T. 8/3/2017-II at 107-108; P26. Prior to the inspection, Mrs. Bari asked the Farivars to turn off the fireplaces for twelve hours before and during the inspection to permit radon testing.  N.T. 8/4/2017 at 103-107; D27.

78.     The Baris also arranged for Ron Miller of Adelphia Plumbing & Heating to attend the inspection to consider a gas line for a generator and to inspect the boiler and boiler systems. N.T. 8/3/2017-II at 111.

79.     Before the inspection, Mr. Bari reviewed the Farivar SPD in conjunction with the Albert SPD.  N.T. 8/7/2017-II at 116.  Mr. Bari also provided both Baltrush and Miller a copy of the Farivar SPD.  N.T. 8/4/2017 at 83.

80.     The Baris attended the inspection, which lasted approximately four hours, and took multiple photographs of the Home.  N.T. 8/7/2017-II at 117; N.T. 8/9/2017 at 138-39; D68. Those photographs show that the fireplaces were off during the inspection, as Mrs. Bari had requested.[10]  N.T. 8/4/2017 at 110-11; D68.

_____

[10]     Before seeing the photographs, Mr. Bari had testified the fireplaces were on during the inspection.  N.T. 8/4/2017 at 102-03, 110-11.  This is an example of Mr. Bari exaggerating and embellishing his testimony to make the Farivars' actions seem more sinister.

81. Although it was approximately 10-15 degrees Fahrenheit outside, the Baris did not recall it being cool in the Home. D26 at Bari1800; N.T. 8/7/2017-II at 120-21; N.T. 8/9/2017 at 141, 143.

82. Mrs. Mostashari met the Baris at the Home for the inspection and told them about the winter storm and fallen trees, although she did not recall saying anything about the tennis court. N.T. 8/8/2017-II at 53, 78. She also informed the Baris about the installation of the new heat pump. Id. at 30. She testified that she said the new heat pump "should make things better." Id. at 31. I find her testimony credible because it is consistent with: (1) what Sila told her; and (2) the fact that the Farivars never updated their SPD to remove their statement about the intermittent heat. See N.T. 8/3/2017-II at 110; supra at ¶¶ 65, 67; infra at ¶ 107.

83. Mr. Bari testified that Mrs. Mostashari told him and Mrs. Bari that they were the beneficiaries of a new heat pump that "would resolve the issues as disclosed of intermittent heat in the [SPD]." N.T. 8/3/2017-II at 110. Mrs. Bari also initially testified that Mrs. Mostashari told them that the intermittent heat issue was resolved by the heat pump. N.T. 8/9/2017 at 143-44. Mrs. Bari later testified, however, that she and Mr. Bari had been "led to believe" that the issue was resolved based on Mrs. Mostashari's statement that they were the beneficiaries of a new heat pump. Id. at 144-45. I find this latter testimony more credible as it is consistent with the averments in the Baris' initial verified complaint and interrogatory answers.[11] See Notice of Removal (doc. 1), Compl. ¶ 34 ("Sellers only advised Buyers orally on March 4, 2014 about the replacement of the internal air handler and external condenser (which led Buyers to reasonably

_____

[11] Although the Baris amended their complaint more than two years later to state that the Farivars had told them that the intermittent heat issues "had been fully remedied and resolved" by the heat pump, I find this substantially delayed averment not credible. See Am. Compl. (doc. 122) ¶ 47.

believe that the 'intermittent' heat issues that were disclosed had been fully resolved."); D47 at Responses at 11, No. 6(a) ("The Sellers' oral disclosure led the Buyers to reasonably believe that the 'intermittent' heat issues that were disclosed in the Sellers' Property Disclosure Statement had been fully resolved.").

84.     Dr. Farivar testified in his deposition that they installed the heat pump in an attempt to remedy the right wing heat issues. Such testimony does not establish that the Farivars believed the heat pump fully resolved the heat issues or that Dr. Farivar, who was not present during the March 4 inspection, told the Baris it corrected the intermittent heat issue.[12] See N.T. 8/8/2017-II at 30; P34 at 169.

85.     As he had done in his 2012 inspection report, Baltrush cautioned the Baris in his 2014 inspection report that it was difficult to determine the adequacy of the "heat distribution system in a one-time inspection."[13] P26 at Bari1813. However, he found that the radiators were receiving heat when tested and the heat system appeared in generally good condition. Id.; N.T. 8/8/2017-I at 43-44.

---

[12]     The Baris argue that the Farivars' answer to their complaint also shows that the Farivars installed the heat pump to remedy the right wing heat issues and told them it was a remedy. See Pl. Findings ¶ 168; Reply Br. (doc. 153) at 14-15. In their answer, the Farivars averred that they "contacted Oliver regarding a remedy to [the right wing heat issues and they] were told by Oliver that it would be necessary to install a heat pump to remedy these issues. . . ." Ans. ¶ 34. This statement does not establish that the Farivars believed the heat pump was a remedy once it was installed, especially because Sila had informed them that it would not completely fix the right wing heat or make the right wing a perfectly temperate zone. See supra at ¶¶ 65, 67. This statement also does not show that the Farivars told the Baris the heat pump resolved the right wing heat problems.

[13]     Baltrush could not recall whether he had been given the Farivar SPD before the inspection. N.T. 8/7/2017-I at 42. However, I credit Mr. Bari's testimony that he provided the SPD to Baltrush. See supra at ¶ 79.

86.     Based on Baltrush's findings, and the fact that no one could recall the Home being cold during the inspection, I find that the Home was adequately heated during the March 2014 inspection when the outside temperature was 10-15 degrees Fahrenheit.

87.     Baltrush was not able to test the air conditioning system because of the cold temperatures.  P26 at 1814; N.T. 8/7/2017-I at 39.

88.     Baltrush reported the same drainage and water infiltration information he cited in 2012: basement leakage can be a "way of life" in old homes; that the front porch and grading were lower/sloped toward the Home; and the driveway sloped towards the Home/garage.  Id. at Bari1806, Bari1810.  He again recommended that the Baris consult with the sellers to learn more about the waterproofing and drainage system.  Id.

89.     At some point, the Farivars told the Baris that the Home's drainage system worked, but advised them to keep the drains clear.  N.T. 8/4/2017 at 52, 76, 85-86; N.T. 8/7/2017-II at 24; N.T. 8/9/2017 at 63.  The Farivars also provided the Baris a maintenance calendar that stated the drains were cleaned twice per year.  N.T. 8/4/2017 at 76, 86.

90.     Baltrush's inspection of the pool and pool house was limited because the pool was winterized and there was snow on the ground.  P27 at Bari1831-32.  Baltrush recommended that the condition of the pool be confirmed when weather permitted.  Id.

91.     On March 13, 2014, the Baris sent the Farivars copies of their inspection reports and a corrective proposal letter.  N.T. 8/7/2017-II at 133-34; D30.  The Baris asked to: (a) reduce the purchase price by $11,250 to allow them to remediate and remove asbestos, repair exterior wood rot and electrical issues, and remove a dead tree; (b) extend the inspection contingency period to allow them to conduct additional asbestos testing; (c) make four repairs on the Property; and (d) inspect the pool and pool house during the pre-closing walk-through.  N.T.

8/7/2017-II at 135-36; D30 at Bari549-550.  The Baris made no request for price reductions based on the heating, drainage, or other issues.

92.     The Farivars agreed to reduce the purchase price by $11,250, allow the additional time for asbestos testing, and complete three of the requested repairs.  N.T. 8/7/2017-II at 142, 146; D36 at Bari569-70; D37; P9D at Bari1286.  The Farivars also stated that although the Baris could view the pool and pool house during the walk-through to make sure they were they were in working order, they could not inspect the pool.  N.T. 8/7/2017-II at 146-47; D36 at Bari569; P9D at Bari1286.

93.     On April 9, 2014, while the Farivars' pool technician was attempting to open the pool, the water line began leaking into the yard behind the pool house.  N.T. 8/7/2017-II at 190; N.T. 8/8/2017-II at 56, 60; P555.

94.     The Farivars immediately called Oliver and a plumber arrived about 1.5 hours later.  N.T. 8/7/2017-II at 198; N.T. 8/8/2017-II at 57; P546; P555.  The plumber capped the water line and recommended that a new line be installed as soon as possible.  N.T. 8/7/2017-II at 191, 194; P542.  The Farivars paid Oliver $537.  N.T. 8/7/2017-II at 192; P542.

95.     On April 15, the Farivars paid Oliver approximately $1,000 to repair the water line.  N.T. 8/7/2017-II at 193; N.T. 8/8/2017-II at 58; P552.  Because the repair was successful, replacement of the water line was not necessary at that time.  N.T. 8/7/2017-II at 196 (Oliver would have needed to replace the line if the repair did not work).

96.     An April 15 photograph taken during the repair shows the leak was several yards away from the pool and no flooding damage is evident.  N.T. 8/7/2017-II at 199, 204; P576.

97.     On April 22, 2014, Oliver checked the Home's three air conditioning units.  D126; N.T. 8/3/2017-I at 29-30.  The technician determined that all air conditioning systems

were "operating well," D126, or in accordance with the standards for cooling homes in the area, N.T. 8/3/2017-I at 30.

98.     On June 19, 2014, the Baris' attorney contacted the Farivars' attorney in anticipation of the June 23 settlement. N.T. 8/7/2017-II at 103-04; P8 at Bari5316. He reminded her that the Farivars needed to update their SPD with a written addendum if any changes occurred since they completed the SPD. P8 at Bari5316. He then stated that because the Baris had "not received any such Addendum [they] will assume that there have been no changes to the underlying facts unless [they] hear otherwise." Id.

99.     The Baris' attorney asked the Farivars to have the air conditioning on for the walk-through and the pool and pool house open. Id. at Bari5316-17. The attorney also explained that he had advised the Baris to bring a pool technician to the walk-through to inspect the pool. Id.

100.     After consulting with the Farivars, the Farivars' attorney responded by stating the Farivars had no additional disclosures to the SPD. N.T. 8/7/2017-II at 91-94; N.T. 8/9/2017 at 54, 70; P8B at Bari6322-23. Dr. Farivar testified that he did not include information about the water line leak because he believed they had sufficiently repaired the leak pursuant to the Sale Agreement and he did not believe the leak was a material defect that was required to be disclosed. See N.T. 8/9/2017 at 56. I find Dr. Farivar's testimony credible. Moreover, it is consistent with a commonsense and reasonable reading of the Sale Agreement and SPD. See supra at ¶¶ 46, 59.

101.     The Farivars' attorney also told the Baris' attorney that the air conditioning would be activated for the walk-through and Dr. Farivar would be there to show the Baris how the pool

worked.  The attorney, however, cautioned that the walk-through was not an inspection.  P8B at Bari6323.

102.    The Baris' attorney stated that they would refrain from bringing a pool technician to the walk-through if Dr. Farivar explained the pool to them and the Farivars provided all of their pool maintenance and service documents. N.T. 8/7/2017-II at 112; P8B at Bari6321-22.  He also requested that the Farivars cool the Home to 72 degrees Fahrenheit.  P8B at Bari6322.

103.    The Farivars subsequently provided the Baris with information related to the pool, but did not provide any documents related to the repaired water line.  See N.T. 8/9/2017 at 56.

104.    On June 23, 2014, the Farivars and Baris met at the Home for the walk-through, which lasted approximately two hours.  N.T. 8/3/2017-II at 112-13; N.T. 8/7/2017-II at 148.

105.    They walked through almost all of the Home and Mr. Bari personally tested the temperature of the air coming from some of the vents with an infrared thermometer.  N.T. 8/3/2017-II at 114; N.T. 8/7/2017-II at 148.  The thermometer showed the air temperature was between 70 and 75 degrees Fahrenheit.  N.T. 8/3/2017-II at 114.

106.    The Farivars also showed the Baris the pool and tennis court.  The Baris did not notice any issues.  N.T. 8/7/2017-II at 148-51; N.T. 8/9/2017 at 151-52.

107.    Following the walk-through, the parties and their attorneys met in Philadelphia for the settlement.  N.T. 8/3/2017-II at 112-13, 117.  The parties closed on the Property without any additional issues being raised about the heat, air conditioning, water infiltration and drainage, tennis court, water line, or Internet wiring.  Id. at 117.  There also were no changes made to the Farivar SPD other than to note that there was no septic tank on the Property.  P9A at Bari3003; N.T. 8/9/2017 at 92.  The SPD, therefore, continued to state that the heat on the first floor of the right wing was "intermittent" and the guest room on the second floor was "cool if very cold."

P9A at Bari3004.  Mrs. Bari understood "intermittent" to mean that sometimes the heat worked and sometimes it did not.  N.T. 8/9/2017 at 148.

108.    Armed with the Farivars' disclosure and two inspection reports, the Baris moved into the Property on July 3, 2014.  N.T. 8/3/2017-II at 119.

109.    After moving into the Home, the Baris noticed that one of the tennis court light poles was broken.  Id. at 119-21; N.T. 8/4/2017 at 17.  The Baris knew a light pole had broken in 2012.  It is unclear whether this was new damage.  N.T. 8/3/2017-II at 120-21.

110.    Mr. Bari also claimed that he observed a crack in the tennis court underneath the light pole.  N.T. 8/4/2017 at 17-20.  A crack, however, is not visible in July 2014 photographs of the light pole and the tennis court taken by Mr. Bari.  See N.T. 8/7/2017-II at 158-61; P57; P61. A crack can be seen in other photographs that Mr. Bari said were taken during the same time period, see N.T. 8/4/2017 at 17-20; P517; P518, but were taken over one year later,[14] see N.T. 8/7/2017-II at 170-72.  Based on these photographs, I find that there was no visible damage to the tennis court when the Farivars lived there or when the Baris moved in.

111.    The July 2014 tennis court photographs taken by Mr. Bari do not show damage to the tennis court fence.  See P57; P61.  I therefore find that the Farivars fully repaired the fence after the February 2014 storm.  See supra at ¶ 75.

112.    Shortly after moving in, the Baris noticed that the air conditioning did not seem to be working and contacted Oliver.[15]  N.T. 8/3/2017-II at 121-22; N.T. 8/3/2017-I at 31-32; N.T. 8/4/2017 at 8; D128.  Mauger went to the Home and stated on the service ticket that the reason for the call was "insufficient A/C and new owners explain house."  D128.  Mauger also stated on

---

[14]      This is another example of the Baris exaggerating and embellishing their testimony.

[15]      The Farivars' service contract with Oliver continued until February 2015.  N.T. 8/3/2017-II at 121-22.

the ticket that the "prior owners did as I recommended and installed a heat pump in the right wing of the house that has always even before Oliver had issues heating."  D128; N.T. 8/3/2017-I at 32.  He added refrigerant to the pump after finding it was low.  N.T. 8/3/2017-I at 32; D128.  He also recommended that the Baris contact Sila to search for a leak in the new pump because Sila had installed the pump, and it was not covered by Oliver's service contract.  N.T. 8/3/2017-I at 32-33; D128.

113.    On July 18, 2014, the Baris contacted Oliver about a possible gas leak and the plumber informed them about the water line leak that had been repaired in April.  See N.T. 8/4/2017 at 40; N.T. 8/7/2017-II at 163; P163 at 2; P22 at Bari1601.  Although the Baris installed a blowout fitting to the water line so it could be winterized, they have not otherwise experienced problems with the line.  N.T. 8/4/2017 at 47, 481; N.T. 8/7/2017-II at 167-68.

114.    Around the same time, the Baris also contacted Oliver about clogged drains in the front and side of the House.  N.T. 8/4/2017 at 31; P1136 at 4; P91; P92.  Oliver cleared the drains, allowing proper water flow.  P91.

115.    On July 30, 2014, the Baris sent the Farivars a letter, claiming for the first time that the Farivars had failed to make accurate and complete disclosures in the Farivar SPD with respect to the air conditioning, heating, boilers, water heater, Viking Grill, window treatments, hardwood flooring, pool water line, plumbing, leaking kitchen faucet, electrical system, indoor lighting, tennis court lights, appliances, gas, and environmental concerns "(including a dying Hemlock tree that could have fallen any moment on the house and posed life safety issues and danger to the main house)."[16]  N.T. 8/4/2017 at 68; P22 at Bari1599-1601.  They demanded that

---

[16]    The Baris also claimed the Farivars: (a) failed to maintain the Property, grounds, fixtures, appliances, and personal property; (b) did not leave the Property free of debris, with all structures broom-clean; and (c) breached the parties' contract in various other ways.  P22 at Bari1601-

the matter be submitted to mediation pursuant to the Sale Agreement, but also suggested a private resolution. P22 at Bari1606.

116.    The Farivars disputed the Baris' claims. N.T. 8/4/2017 at 69; P23. They explained that the air conditioning and heating–other than in the right wing, which had been disclosed–were adequate. P23 at Bari1558-59. They said they were unaware of issues with the tennis court lights and had fixed the water line leak, but apologized for not remembering to update the SPD with information about the leak. Id. at Bari1564. The Farivars offered to pay approximately $1,200 for clean-up costs and two repairs to resolve all issues. P23 at Bari1584.

117.    The Baris demanded mediation, seeking $120,000 in damages. N.T. 8/4/2017 at 69; N.T. 8/9/2017 at 156-57; D42. The Farivars refused to participate. N.T. 8/4/2017 at 70.

118.    In April 2015, the Baris filed their complaint in the Court of Common Pleas of Montgomery County, Pennsylvania. See Notice of Removal, Compl. They alleged the Farivars committed fraud and violated the UTPCPL by failing to disclose: (a) significant damage to a tennis court light pole; (b) a basement leak; (c) warping to various sections of the hardwood floor; (d) a dying hemlock tree; (e) insufficient heat and air conditioning; (f) the water line leak; (g) hazardous material left throughout the Property; and (h) problems with exterior water drainage and interior water infiltration. Id. at ¶¶ 10-80. They sought rescission of the sale or money damages. Id. at 13-16.

119.    The case was removed by the Farivars to this Court. See Notice of Removal. After the conclusion of discovery, I ordered the Baris to file an amended complaint to choose the remedy of rescission or money damages. See 5/8/2017 Order (doc. 116). In July 2017, the Baris filed an amended complaint, seeking money damages. See Am. Compl. at pp. 27-30. The Baris

---

1606. Such allegations again illustrate the Baris' tendency to exaggerate and embellish the problems caused by the Farivars in an attempt to justify their claims.

also amended some of their factual allegations. They no longer asserted that the Farivars had failed to disclose the warped hardwood floors or the dying hemlock tree. See id. However, they added claims that the Farivars had failed to disclose material defects related to the tennis court, tennis court fence, an electric cable line outside the Home, the Internet wiring, kitchen countertops, and suspected damage to a basement toilet sewer drain.[17] See id. at ¶¶ 42, 57-65, 93-94.

120.     The Baris testified that the heat does not work in any of the Home's three wings.[18] See N.T. 8/3/2017-II at 138-42; P384 (thermostat readings taken in February 2016); N.T. 8/4/2017 at 81; N.T. 8/9/2017 at 96, 104. To compensate, they use the fireplaces and space heaters, dress warmly, and stay out of the right wing because it is too cold. N.T. 8/4/2017 at 4, 61; N.T. 8/9/2017 at 96, 174-76.

121.     Mrs. Bari testified that although the air conditioner functions, it is not effective and they have issues with condensation and dripping onto the living room floor. N.T. 8/9/2017 at 96, 177.

122.     Although I find the Baris' testimony about their current experiences with the Home's heat and air conditioning sincere, such testimony fails to establish that the Farivars experienced the same extensive problems, or knew about them. No evidence supports that at the time of the sale, the Home lacked working heat or air conditioning in all three wings, as the Baris now allege.

---

[17]     The Baris also alleged emotional distress damages, but I struck those allegations. See Am. Compl. at ¶¶ 124-26; 7/21/2017 Order (doc. 125).

[18]     The Baris testified that only one room in the Home has more than sufficient heat. N.T. 8/4/2017 at 61.

123. The Baris also testified that since March 2015 they have experienced significant flooding around the Home as well as water infiltration in the basement, kitchen, and bar area during thunderstorms. N.T. 8/4/2017 at 31-32, 49-52; N.T. 8/9/2017 at 97-99, 104-08; see also Notice of Removal, Compl. ¶¶ 43, 49 ("During March of 2015, Buyers discovered for the first time that there had been significant problems with water drainage and interior water infiltration to the basement of the house"); Am. Compl. ¶¶ 81, 88 (same); D47, Resp. at 24, No. 9(a) (same). The Baris eventually dug up the front lawn and re-piped "various areas of the underground rain conductors to move water away from the front of the house." N.T. 8/4/2017 at 32; see also N.T. 8/9/2017 at 109-11; P1142 at 4; P98 at Bari3286 (June 2015 invoice for installation of new pipe). Despite these improvements and the Baris' efforts to keep the drains clear of leaves and other debris, water still infiltrates the Home. N.T. 8/9/2017 at 104-07, 111.

124. The Baris stated that if the Farivars had fully disclosed the issues with the heat, air conditioning, drainage and water infiltration, water line leak, and tennis court, it would have affected their decision to buy the Home. N.T. 8/4/2017 at 6-7, 11-12, 39, 44, 57-58, 71-72; N.T. 8/9/2017 at 100-01, 112-13, 115-16.

125. The Baris seek approximately $594,000 in compensatory damages based on a 10-page spreadsheet they created to summarize their expenses and estimates allegedly related to the undisclosed defects. Pl. Findings ¶ 490; P1142; N.T. 8/9/2017 at 120-30.

126. The Baris presented Michael Shade as an expert in heating and air conditioning systems, electrical wiring, and remediation approaches and costs. N.T. 8/8/2017-II at 81-82.

127. Shade examined the Home's HVAC systems in October 2015. Id. at 118. He determined that the Home's boiler system worked fine, but that heat produced by the boilers did not adequately flow throughout the Home. Id. at 86-87, 97; D45 at 2. He suggested it was based

on problems with the piping used to distribute the heat. Id. at 86-87, 97; D45 at 2. Shade said the distribution problem existed in all three of the Home's wings, although the right wing was the coldest and the center wing was the warmest. Id. at 89, 100. Shade believed a layperson should describe the right wing as having "no heat," not "intermittent" heat. Id. at 117. Nevertheless, Shade said he could have detected the piping defects even if the right wing was described as having "intermittent" heat. Id. at 140-41.

128.     Shade disagreed with Baltrush's 2014 inspection findings that the heating system functioned properly when tested and appeared to be in generally good condition. Id. at 120. During his deposition, Shade testified that Baltrush's findings were not reliable because Baltrush performed his inspection on a mild seasonable day. Id. at 121. However, when told at trial that Baltrush inspected the Home on a 10-degree day, which he agreed was not a mild seasonable day, Shade stated that he disagreed with Baltrush because the pipes in the Home would remain cold despite the heat being turned on. Id. at 124, 127.

129.     Shade explained that the air conditioning system had old fiberglass ductwork that needed to be replaced and that condensation tended to form on some of the air conditioning units. Id. at 91, 94, 98-99, 100-01, 103. He acknowledged that these problems were not readily observable. Id. at 92.

130.     Shade initially testified that the heat and air conditioning problems had existed for years, id at 93-94, but later acknowledged that he could not say how long they had been happening, id. at 128, 133. Shade also testified that he could not say what the Farivars knew when they lived in the Home. Id. at 133.

131.     Shade said the Internet wiring was randomly put in the Home and did not follow the proper standards.  Id. at 92.  He believed a new wire cable should be installed at the Home.[19] Id. at 104.

132.     Shade initially testified that the damages claimed by the Baris for the heating, air conditioning, and Internet problems were reasonable.  Id. at 107-16.  However, he later said the damages for new attic stairs and removal of the power line on the exterior of the Home were not related to the heat and air conditioning problems.  Id. at 115-16.  He also could not say that the damages would be as significant as the Baris claimed.  Id. at 136.

133.     I credit Shade's testimony that the Home had heat problems in all three wings when he inspected it in October 2015.  Such testimony, however, fails to establish that the Farivars experienced the same problems during their ownership more than one year earlier. Indeed, if such problems existed, Shade's testimony shows that Baltrush should have been able to identify issues with the heat supply during his March 2014 inspection.   Similarly, although I credit Shade's testimony that the air conditioning ductwork should be replaced and insulated, his testimony fails to show that the Farivars knew this.  Shade's testimony also does not establish that the Internet wiring did not work; it merely shows that it was not properly installed.

134.     The Baris presented Fred Albert as an expert in landscaping, hardscaping, storm water management, tennis courts, swimming pools, and water lines.  Id. at 146-48.  Although

---

[19]     No other evidence was introduced at trial about the Internet wiring.  The Baris cite two exhibits in support of their claim and contend these exhibits may be considered as they were referenced in their damages spreadsheet.  See Pl. Findings ¶¶ 361-62 (citing P186, P187).  The references to these exhibits on the Baris' damages spreadsheet (which does not cite the same exhibit or bates number, although I assume they are meant to be the same) does not make these exhibits admissible. The Baris needed to separately present the exhibits at trial and provide the Farivars with an opportunity to respond.  In any event, even considering these exhibits, they fail to show that the Internet wiring was a material defect that the Farivars had to disclose pursuant to the RESDL.

Albert testified to various damages at the Home, he did not opine about conditions existing when the Farivars lived there.  Id. at 149.

135.     Albert said that when he first visited the Home in October 2015, he observed damage to the tennis court fence, damage to the backboard, a crack in the center of the court, a three-foot structural crack underneath the tennis court lights, and indentations from something dropped on the court.  N.T. 8/8/2017-II at 152-54; P42C at 33-41.  He did not testify to the cause of these damages.  N.T. 8/8/2017-II at 158-59.  I precluded such testimony because it was speculative and Albert did not provide any reliable methodology for his opinions.  See id.; Fed. R. Evid. 702.

136.     Albert also determined from photographs taken by the Baris that a light pole on the tennis court was damaged when the Baris moved into the Home.  N.T. 8/8/2017-II at 154-56.  Albert opined that the light was hit by a fallen tree during the February 2014 storm.  Id. at 154-55.  Although he based his opinion on the claim report prepared by the Farivars' insurance company, that report said nothing about damage to a light, and the tree company that performed the clean-up work did not note a fallen tree on the court.  Id.; supra at ¶¶ 70, 73.  Albert also testified that a damaged bolt on the light pole must have been hit by something of incredible force.  N.T. 8/8/2017-II at 154-55.

137.     Based on videos taken by the Baris, Albert found that the Home had severe drainage problems.  Id. at 159-61.  He explained that "water cascades down towards the house down the driveway" and "there was nothing but an eight-inch square drain, which [he believed] was not functioning anyway, and even if it was, it couldn't have stopped the amount of water that was coming down that hillside."  Id. at 160.  Albert later acknowledged there were trench drains along the driveway, but he did not believe those drains were adequate to prevent the water

infiltration.  Id. at 161-62.  He also testified that the abundance of water in front of the Home had damaged landscaping and hardscaping, requiring stones to be reset and regrouted.  Id. at 171, 186.

138.     Albert opined that the April 2014 water line leak eroded the coping around the pool.  Id. at 170-72.  Although he initially said that the water flowed above ground to the pool, he later testified, when challenged, that the water somehow flowed below ground and ascended to ground level at the pool area.  Compare id. at 170-71, with id. at 175-76.  Albert believed the coping was in good condition before the leak based on the Baris' July 2012 pool inspection report.  Id.; N.T. 8/9/2017 at 30; see also P549.  However, Albert acknowledged that pool coping can be damaged in one season or less depending on conditions.  N.T. 8/9/2017 at 30.

139.     Albert testified that the damages claimed by the Baris relating to the tennis court, drainage and water infiltration, and pool problems were reasonable.  N.T. 8/8/2017-II at 181-87; N.T. 8/9/2017 at 31.  Albert, however, could not explain when some of the estimates were provided, the identity or qualifications of who provided them, or why certain amounts did not coincide with the supporting documentation.  N.T. 8/9/2017 at 32-38, 41.  Albert also insisted that certain damages claimed by the Baris related to the water line leak even though such relationship was tenuous at best.  Id. at 39-41 (June 2015 repair to water filter was attributed to water line leak), 44-45 (removal of trees was related to water line defect because some trees were probably killed by the water line).

140.     Albert was not credible and I reject his testimony because it was riddled with inconsistencies, half-truths, and blind reliance on damage summaries prepared by the Baris.  I also find that much of his testimony was speculative and he was biased in favor of the Baris, whom he had known for 13 years.  See N.T. 8/8/2017-II at 157-59, 162, 177; N.T. 8/9/2017 at 8.

141.     Neal Jacobs, who examined the tennis court in August 2015 to provide Mr. Bari

with an estimate for resurfacing, testified that there were only two very small cracks totaling

three feet on the court.[20]  N.T. 8/8/2017-II at 191, 193, 195-96; D231.  Jacobs also found that the

backboard was separating as a result of its age.  N.T. 8/8/2017-II at 196.  Although Jacobs

thought the fence was fine, he noted that Mr. Bari wanted the chain link part of the fence

replaced.  Id. at 196-97.  I find Jacob's testimony credible, especially as he had no allegiance to

either party.  I therefore find that one year after the Baris moved into the Home, there were only

two small cracks on the tennis court, the backboard was separating because of age, and the fence

was in good condition.

## CONCLUSIONS OF LAW

1.     The Baris claim that the Farivars are liable for fraud and violating the UTPCPL

for failing to disclose: (a) the heating defects throughout the Home; (b) the air conditioning

defects; (c) the exterior drainage and water infiltration defects; (d) the tennis court defects; (e)

the water line defects; and (f) the Internet wiring defects.  See Pl. Findings at 146-90, 211-22.

They seek compensatory, punitive, and treble damages, as well as attorney fees.  See id. at 148,

216-21.

2.     Although the Baris agreed in the Sale Agreement to release and discharge the

Farivars from all claims for damage and its consequences arising from defects or conditions of

the Property, this release did not preclude the Baris from bringing a claim against the Farivars if

they were in default under the terms of the Sale Agreement or violated seller disclosure laws.

---

[20]     Jacobs proposed resurfacing the court for approximately $9,200.  N.T. 8/8/2017-II at 199-
200; D233.  He also said that if the cracks reappeared, they could be fixed for a minimal fee.  Id.
at 205-06.  The Baris are claiming approximately $45,000 to resurface the court with a cushioned
matting system proposed when the court was inspected in 2012, during their initial attempt to
purchase the Home.  P1142 at 3; D13.

See D24 at ¶ 25; supra at ¶ 61.  To prove their fraud and UTPCPL claims, the Baris must first show that the Farivars' actions involved a default of the Sale Agreement or a violation of the RESDL.

3.     Because the Sale Agreement did not incorporate any of the representations made by the Farivars in their SPD, the Farivars did not breach that agreement by making misrepresentations in their SPD.  See D24 at Bari379.  However, in the Addendum to the Sale Agreement, the Farivars agreed to provide written updates to the SPD within two days of any "event/issue transpiring that would require disclosure under the [Farivar SPD]" if the Farivars were completing a new SPD after the event.  D24 at Bari394, supra at ¶ 62.  The Farivars therefore were in default of the Sale Agreement if they failed to provide written updates regarding any of the information required by their SPD.[21]

4.     The RESDL required the Farivars to disclose known material defects on a seller disclosure statement.[22]  See 68 Pa. C.S. § 7303.  Although the disclosure statement had to include information on certain subjects, the Farivars could use a form requiring "greater specificity" or more information than that required by the RESDL, as the Farivars did here.  68 Pa. C.S. § 7304(a); supra at ¶ 47; compare P9A, with 68 Pa. C.S. § 7304, 49 Pa. Code § 35.335a.

---

[21]     The Farivars contend that the Baris waived any breach of contract claim by failing to plead such a claim.  See Def. Findings of Facts and Conclusions of Law (doc. 150) at 81 ¶ 40.  They also contend that such claims are barred because the Sale Agreement merged into the deed.  See id.; but see id. at 68 ¶ 3, 69 ¶ 5 (relying on integration and release clauses in agreement).  Although the Baris have not pled a breach of contract claim, they may nevertheless show there was a default of the agreement to proceed on their fraud and UTPCPL claims.  Similarly, although merger of the contract into the deed is the general rule, it does not apply where the deed shows the parties intended otherwise or where one party committed fraud.  See In re: Trust of Marilyn Mihordin, 162 A.3d 1166, 1171-72 (Pa. Super. 2017).  Because the parties have presented no evidence of the deed and the Baris have brought a claim of fraud, I cannot find the Sale Agreement merged into the deed.

[22]     The material defect definition provided in the Farivar SPD is the same one provided by the RESDL.  See supra at ¶ 46.

The Farivars, however, still needed to abide by all of the provisions of the RESDL in completing their SPD.[23]

5.      If "an item of information required to be disclosed [was] unknown or not available to the [Farivars, they could] make a disclosure based on the best information available to [them]." 68 Pa. C.S. § 7306. The Farivars also were not obligated "to make any specific investigation or inquiry in an effort to complete the [SPD]." Id. § 7308.

6.      The Farivars could "not make any representations" in the SPD that they knew or had "reason to know [were] false, deceptive or misleading" and could "not fail to disclose a known material defect." Id. Further, "[i]f information disclosed [was] subsequently rendered inaccurate prior to final settlement as a result of any act, occurrence or agreement subsequent to the delivery of the [SPD, the Farivars were required to] notify [the Baris] of the inaccuracy." Id. § 7307.

7.      The Farivars, however, cannot be held liable under the RESDL "for any error, inaccuracy or omission of any information" required by the RESDL if: (a) they "had no knowledge of the error, inaccuracy or omission"; or (b) "the error, inaccuracy or omission was based on a reasonable belief that a material defect or other matter not disclosed had been corrected." Id. § 7309(a). Similarly, the Farivars cannot be liable under the RESDL for: (a) "material defects to the property disclosed to the buyer prior to the signing" of the Sale Agreement; (b) "material defects that develop after the" Sale Agreement; or (c) "material defects that occur after final settlement." Id. § 7314.

---

[23]      The Farivars' use of a broader SPD did not require them to disclose information beyond what was included in the form, but it did require them to answer their SPD in accordance with the RESDL. See e.g., Milliken v. Jacano, 103 A.3d 806, 809 (Pa. 2014) ("Voluntarily revealing more than is required does not create additional involuntary requirements.").

8.　　To prove fraud, the Baris had to establish by clear and convincing evidence: (a) a representation, which may include an affirmative statement, a concealment, or a failure to disclose where there was a duty to disclose; (b) which was material to the transaction at hand; (c) made falsely with knowledge of its falsity or recklessness as to whether it was true or false; (d) with the intent of misleading another into relying on it; (e) justifiable reliance on the misrepresentation; and (f) damage proximately caused by the reliance.  See Gibbs v. Ernst, 647 A.2d 882, 889 n.12 (Pa. 1994); Blumenstock v. Gibson, 811 A.2d 1029, 1034 (Pa. Super. 2002); Lutzky v. Petcove, No. 06-2229, 2006 WL 2456466, at *2 (E.D. Pa. Aug. 21, 2006).

9.　　The UTPCPL prohibits various "unfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce."  73 P.S. § 201-3.  The Baris contend the Farivars breached the UTPCPL by making misrepresentations and omissions, and engaging in fraudulent and deceptive conduct that created a likelihood of confusion or misunderstanding. See Am. Compl. at ¶ 133 (citing 73 P.S. §§ 201-2(4)(ii), 201-2(4)(v), 201-2(4)(xxi)).  To establish such violations, the Baris must show by a preponderance of the evidence that: (a) the Farivars made misrepresentations and omissions, or engaged in fraudulent or deceptive conduct; (b) the Baris justifiably relied on those actions; and (c) they suffered harm as a result. See Ries v. Curtis, No. 13-1400, 2014 WL 5364972, at *9-11 (E.D. Pa. Oct. 22, 2014).  Although the Baris do not need to prove fraud to show deceptive conduct, they must show the Farivars knew their conduct was false or misleading.  See Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 498 (3d Cir. 2013).

**Heating Defects**

10.　　The Baris contend that the Farivars failed to properly disclose the "systematic hydronic heating problems that were pervasive throughout the entire house."  Pl. Findings at 160.

They assert the Farivars knew about these problems based on their experiences living in the Home and information provided to them by Oliver and Sila.  See id.

11.     Because the Farivars knew about a heating defect in the right wing of the Home, see supra at ¶¶ 27, 31, they were required by the RESDL to disclose this defect in their SPD pursuant to the RESDL.  68 Pa. C.S. §§ 7303, 7304; P9A at Bari3000.  The Farivars did not need to disclose other unknown heating defects.  68 Pa. C.S. § 7303; P9A at Bari3000.

12.     The Farivars properly disclosed the right wing heating defect by stating in their SPD that they knew of problems or repairs needed with the heat, and by explaining that the family room and bar room heat was "intermittent" and the upstairs guest room heat was "cool if very cold."  See P9A at Bari3004.  This disclosure fully informed the Baris that the heat did not always work in the family room and bar room, and the heat functioned poorly in the upstairs guest room.  See https://www.merriam-webster.com/dictionary/intermittent (last visited 3/1/2018) (defining intermittent as coming and going, not continuous); see also supra at ¶ 107 (Mrs. Bari understood intermittent to mean that sometimes the heat worked and sometimes it did not).  This disclosure was not false, deceptive, or misleading because Mauger, who was familiar with the heat issues in the Home during the Alberts', the Farivars', and Baris' ownership, agreed that the heat in the right wing was "intermittent."  See supra at ¶ 32.  Further, although the right wing heat was reported as not working at times, other times it seemed to be fine, including when the Baris visited the Home in December 2013, and during the Baris' 2014 inspection when the temperature was 10-15 degrees Fahrenheit.  See supra at ¶¶ 42, 86.

13.     The Farivars were not required by the RESDL to state that there was either an airbound or flow issue, as reported on Oliver's December 2013 service ticket, because that issue still needed to be investigated and the Farivars had no duty to "make any specific investigation or

inquiry" to complete the SPD.  See 68 Pa. C.S. § 7308; supra at ¶ 41.  The Farivars' statements on the SPD were sufficient to inform the Baris of a problem with the heating system in the right wing.  The Baris even supplemented their standard home inspection (their second in two years) with a heating and plumbing specialist to inspect the boilers.  See supra at ¶ 78.

14.     The Farivars did not need to update their SPD pursuant to the Sale Agreement to state that the boiler zone in the right wing was not working, as reported by Sila in February 2014, because that was not a new diagnosis of new problems.  See supra at ¶ 64.   The Sila comment was based on Mrs. Mostashari's statements to Sila about the right wing problems.  See id.  Moreover, the Farivars had already sufficiently notified the Baris of heating problems in the right wing in their SPD.  See supra Conclusion of Law ("COL") at ¶ 12.

15.     The Farivars likewise did not need to update their SPD to state that the heat pump ductwork was not ideal and should be reconfigured if not limited by space, as reported by Sila.  See supra at ¶ 67.  This information did not concern a material defect because it did not show that the ductwork was not working; it merely showed the ductwork was not the best fit.  Moreover, the suggested repair was hampered by space limitations.

16.     The Baris also have failed to show that Mrs. Mostashari's statement that the heat pump should make the intermitted heat better was false, deceptive, or misleading.  See supra at ¶ 82.  Oliver advised Mrs. Mostashari to install a heat pump in the right wing to improve the heat and the Farivars spent $7,396 to install such a pump.  See supra at ¶¶ 33, 56.  Sila told Mrs. Mostashari that the heat pump would make things better, although it would not make the right wing a perfectly temperate zone or be a complete fix.  See supra at ¶¶ 65, 67.  Moreover, after the heat pump was installed, Mrs. Mostashari noted that she loved it warm.  See supra at ¶ 66.

Such information establishes that Mrs. Mostahari's statement was not false, deceptive, or misleading.

17.     Even assuming Mrs. Mostashari's statement could be construed as false, deceptive, or misleading, the Baris cannot show they justifiably relied on it to conclude that the right wing heat issues were resolved.  See Blumenstock, 811 A.2d at 1034; LeDonne v. Kessler, 389 A.2d 1123, 1130 (Pa. Super. 1978).  The parties agreed that the Sale Agreement contained their whole agreement and there were no other oral representations concerning the sale.  D24 at Bari379; supra ¶ 61.  Pennsylvania courts have allowed evidence of oral representations despite such integration clauses in some residential property sale cases where the terms of the integration clause were limited and the buyer had knowledge of the objectionable conditions.  See Blumenstock, 811 A.2d at 1036-38; LeDonne, 389 A.2d at 1129-31.  That exception does not apply here.

18.     The integration clause in the Sale Agreement was broad, barring representations "of any kind whatsoever concerning [the] sale."  D24 at Bari379; cf. LeDonne, 389 A.2d at 1129 (integration clause barred representations about the character of the land reasonably apparent from an inspection).  Although the Baris and their inspectors did not discover a heating issue during their inspection of the Home, the Baris and their inspectors knew there was an issue that merited further investigation because they possessed the Farivar SPD, which alerted them to problems related to the right wing heat.  See P9A at Bari3004; supra at ¶¶ 51, 79.  The Farivars also never removed this disclosure from their SPD even after spending $7,396 for a new heat pump and being asked by the Baris if there were any updates to the SPD.  See supra at ¶ 100.

19.     If the Baris believed from Mrs. Mostashari's oral representation that the intermittent heat had been resolved, they needed to "insist upon written contractual protection."

LeDonne, 389 A.2d at 1130. Instead, they "signed an agreement in which they explicitly waived their right to rely upon any oral representations they may have received" concerning the sale. Id. The Baris failed to demonstrate justifiable reliance under these circumstances. Id. (barring oral representation of problem where party knew about problem yet agreed in contract that "he has received no promises about [problem]"); Blumenstock, 811 A.2d at 1038 (buyers could "not move beyond the terms of the integrated agreement of sale to explore purported oral representations" where buyers should have known about the problem).

20. The Farivars' failure to disclose their use of space heaters in the right wing as "an additional and/or backup heating system" on their SPD could, when viewed in isolation, be deemed a false or misleading nondisclosure. However, the Farivars' use of space heaters related to the same right wing "intermittent" heat problems that they disclosed to the Baris in their SPD. Given the explicit disclosure of right wing heat problems, the Baris cannot show that they justifiably relied on the nondisclosure of space heaters in failing to discover the right wing heating issues, or that this nondisclosure proximately caused their harm. Such evidence undermines their ability to establish that their reliance was reasonable or that they would have acted any differently if they had been provided information about the Farivars' use of space heaters in the right wing. See Porreco v. Porreco, 811 A.2d 566, 571 (Pa. 2002) ("To be justifiable, reliance upon the representation of another must be reasonable."); Commonwealth v. Ortho-McNeil-Janssen Pharm., Inc., 52 A.3d 4989, 511 (Pa. Commw. 2012) (to establish proximate causation, plaintiff must show he would have acted differently had he known the true facts). Their multiple inspections, and passion to buy the Home, further undermine their ability to establish reasonable reliance.

21.     The Baris have failed to prove their claims of fraud or violation of the UTPCPL based on the Farivars' failure to disclose heating defects.

**Air Conditioning Defects**

22.     The Baris contend the Farivars failed to disclose that certain air conditioning ducts were not insulated and that the right wing air conditioning unit was in poor condition.[24]

23.     Even assuming the Farivars knew about the uninsulated ducts based on the inspection performed for them in 2012,[25] this issue did not constitute a material defect that they were required to disclose under the RESDL. See supra Findings of Fact ("FOF") at ¶ 18. The lack of insulation did not significantly impact the value of the Property because it did not affect the air conditioning system's performance. See supra FOF at ¶ 18; 68 Pa. C.S. § 7102; P9A at Bari3000. It also did not involve an unreasonable risk to people on the Property. Although condensation on the ducts could lead to mold growth, there was no evidence of such growth. Further, any dripping could be easily remedied by adding insulation to the areas where it was missing. See P24 at Farivar4047, 4049.

24.     The Baris also failed to show the Farivars were required by the RESDL to report a material defect with the right wing air conditioning unit. The unit was working; Oliver recommended that they replace it only because it was 28 years old and in poor condition. See supra ¶¶ 37, 38, 97. This issue, therefore, concerned the air conditioning unit's "useful life," rather than a material defect. 68 Pa. C.S. § 7102; P9A at Bari3000. Even if the Farivars were

---

[24]     The Baris also argue that the Farivars should have disclosed that the ductwork was not ideal in the air conditioning section of their SPD. The Farivars did not need to disclose this information for the same reasons they did not need to disclose it in the heating section of their SPD. See supra COL at ¶ 15.

[25]     Although Mr. Farivar did not read the inspection report, he did talk to the inspector and might have learned of the uninsulated ducts at that time. See supra FOF at ¶ 20. The Baris, however, have failed to prove his actual knowledge by a preponderance of the evidence.

required to report the condition of the air conditioning unit, the Baris failed to establish that the Farivars' nondisclosure proximately caused them damages because the Farivars replaced the unit before the Baris purchased the Home and the Baris knew about that replacement.

25.     The Baris failed to prove their claims of fraud and violation of the UTPCPL based on the Farivars' failure to disclose air conditioning defects.

## Drainage and Water Infiltration Defects

26.     The Baris argue the Farivars failed to disclose that the outside drains required constant clearing to ensure they worked and water did not infiltrate the Home.

27.     The need to clear the drains of leaves or other debris during rainstorms was not a material defect required to be disclosed by the RESDL.   This was a matter of common sense, especially given the Property's landscape (downhill with water runoff) and inspector Baltrush's warnings.  See supra FOF ¶¶ 11, 12, 88.

28.     The Baris also assert that the Farivars' frequent need to clear the outside drains shows that they experienced drainage and water infiltration issues that were not disclosed. However, I found the Farivars' testimony that they experienced only the one water infiltration issue disclosed in their SPD credible.  See supra at ¶ 25.

29.     The Baris failed to prove their claims of fraud and violation of the UTPCPL based on the Farivars' failure to disclose the drainage and water infiltration defects.

## Tennis Court Defects

30.     The Baris argue the Farivars failed to disclose damage to the tennis court from the February 2014 storm or their insurance claim for this incident.

31.     The Farivars were required to state in their SPD whether they were aware of any storm damage to the Property.  P9A at Bari3001.  The Farivars also were required by the

Addendum to the Sale Agreement to update the SPD within two days of any event/issue that would require disclosure under the SPD.  See D24 at Bari394.  Such an update, however, was necessary only for known material defects.  See P9A at Bari3000.  The Farivars knew the February 2014 storm had left a tree limb on the tennis court and broken a portion of the tennis court fence; they did not know about damage to the tennis court itself, the tennis court backboard, or one of the lights.  See supra at ¶¶ 69, 71.  Because the damage known to the Farivars did not have a significant adverse impact on the value of the Property or involve an unreasonable risk to the Property, it was not a material defect the Farivars had to disclose under the SPD or update pursuant to the Sale Agreement.[26]  See P9A at Bari3000.

      32.    Even if the Farivars should have updated the SPD with information about the February 2014 storm damage, the Baris have failed to show the Farivars acted with an intent to mislead, as required to prove their fraud and UTPCPL claims.  See Belmont, 708 F.3d at 498 (violation of UTPCPL requires knowledge of misleading quality of conduct); Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1187 (Pa. Super. 2005) (complaining party must show intent to mislead to establish fraud); Glover v. Deem, 2005 WL 3008177, at *4 (Pa. C.C.P. Wash. Co. Aug. 23, 2005) (dismissing fraud and UTPCPL claims where defendant did not act with intent to mislead).  Although the Baris contend the Farivars purposefully misled them by promptly having the tree limbs around the tennis court removed and fixing the fence, I instead conclude that those actions were taken in good faith to make sure the Home and tennis court were in good condition when inspected by the Baris.  See supra at ¶ 76.

---

[26]    The Baris argue that I should sanction the Farivars because they destroyed the evidence of the storm damage without giving them an opportunity to view and inspect it.  See Pl. Findings at 191-203.  This claim is frivolous.  Moreover, because I conclude that the Farivars had no obligation to disclose the storm damage, they acted properly in repairing that damage, and improving the Property, without informing the Baris about it.

33.     The Farivar SPD also asked whether the Farivars were aware of insurance claims filed relating to the Property.  See P9A at Bari3007.  Because I have found that Mrs. Mostashari did not know that her call to the insurance company about the storm damage resulted in the creation of an insurance claim report, see supra at ¶ 70, I conclude the Farivars did not need to update the SPD with information about an unknown claim, see P9A at Bari3007.

34.     The Baris have failed to prove their claims of fraud and violation of the UTPCPL based on the Farivars' failure to disclose air conditioning defects.

**Water Line Defect**

35.     The Baris argue the Farivars failed to disclose the April 2014 water line leak.

36.     In the SPD, the Farivars were required to disclose whether they were aware of any leaks or other problems relating to the water supply, pumping systems, and related systems, as well as the location of any such leaks, the extent of the problem, and any repair or remediation efforts.  P9A at Bari3003.  Even assuming the Farivars should have updated this response with information about the April 2014 water line leak pursuant to the Addendum to the Sale Agreement, see D24 at Bari394, the Baris failed to show the Farivars acted with an intent to mislead.  Dr. Farivar credibly explained that he did not believe he had to disclose the water line leak because they had repaired the leak pursuant to the maintenance provision of the Sale Agreement.  See supra at ¶ 100.  Evidence from Oliver confirms this.  See supra at ¶ 95.  Dr. Farivar also said that they did not believe the leak was a material defect.[27]  See supra at ¶ 100.

---

[27]     The Baris argue that the Farivars acted deceptively because the Farivars also refused to allow them to inspect the pool after the water line leak and failed to provide them with documents about the water line leak.  I find that these actions did not establish a deceptive intent by the Farivars.

37.     The Baris also have not shown that the Farivars' failure to provide information about the water line leak proximately caused them damage.  Although Oliver initially recommended that the water line be replaced, Oliver was able to successfully repair the line, making a replacement no longer necessary, which is a common practice in making home repairs.  See supra at ¶ 95.  The Baris also have not experienced any further leaks with the water line.[28]  See supra at ¶ 113.  Only Albert testified that the leak damaged the pool coping and landscaping, but his testimony was incredible and rejected.  See supra at ¶¶ 139, 141.  There is no evidence the leak caused any damage.

38.     The Baris argue I should find in their favor because the Farivars' repair of the leak without first informing them of it prevented them from investigating the damages from the leak.  In deciding whether to sanction a party for destruction of evidence, I must consider: (1) the fault of the party who destroyed evidence; (2) prejudice to the opposing party; and (3) what sanction will avoid substantial unfairness to the opposing party and deter misconduct by others in the future.  Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).  The Farivars cannot be faulted for repairing the water line leak because they acted pursuant to the terms of the Sale Agreement.  Similarly, because the Baris have not suffered any further damages since the water line was repaired, they were not prejudiced by the Farivars' conduct.  A sanction against the Farivars is unwarranted.

39.     The Baris failed to prove their claims of fraud and violation of the UTPCPL based on the Farivars' failure to disclose the water line defect.

---

[28]     Although the Baris installed a blowout fitting, that was a maintenance issue.

**Internet Wiring Defect**

40.     Although the Baris argue that the Farivars did not disclose the defective Internet wiring throughout the Home, they have failed to prove that the wiring was defective or that the Farivars knew about the defect.  <u>See</u> <u>supra</u> at ¶ 131 n.19.  Thus, the Baris also have failed to prove their claims of fraud or violation of the UTPCPL based on the Farivars' failure to disclose the Internet wiring defect.

**Damages**

41.     Because I conclude that the Baris have failed to prove their claims of fraud and violation of the UTPCPL with regard to all of their claims, I deny their claims for compensatory, treble, and punitive damages, as well as attorney fees.

42.     Judgment shall be entered in favor of the Farivars.  An appropriate Order follows.